[Civ. No. 888.   Third Appellate District.—February 8, 1912.]

## IDA LOUISA EMILIA BOHN, Respondent, v. ROBERT GUNTHER, Appellant.

ACTION TO QUIET TITLE—DEED OF GIFT TO PLAINTIFF—DELIVERY—PRESUMPTION—SUPPORT OF FINDING AND JUDGMENT.—Where the plaintiff in an action to quiet title produces a deed of gift to her from the defendant, she has the right to rely upon the presumption of its delivery from the fact of her possession, unless overcome by counterevidence; but where in addition to her own testimony as to its delivery, the presumption was also strongly fortified by the positive testimony of a number of other witnesses, a finding of such delivery is amply supported by the evidence, and is sufficient to sustain the judgment rendered in her favor.

ID.—JUDGMENT FOR LIFE ESTATE IN DEFENDANT WITHIN JURISDICTION—TITLE IN CONTROVERSY—PLEADINGS.—Where, in the action to quiet title, the title was in controversy, and each party sought to quiet title, and to cancel a deed, and there is sufficient evidence, including the testimony of the plaintiff and defendant, corroborated by correspondence, as well as by the terms of the deed of gift, making it evident that it was distinctly understood that defendant was to have the use and enjoyment of the property during his life, and that plaintiff was to have the fee subject to such life estate, the court had jurisdiction in equity to determine the true estates of the respective parties, and to find and adjudge the title in plaintiff, subject to such life estate, though not specially referred to in the pleadings.

ID.—WHOLE TITLE IN CONTROVERSY INCLUSIVE OF PART.—Since the whole of the title in controversy includes a part thereof, it cannot be said that the finding of a life estate in the defendant is entirely outside of the matter alleged in the pleadings of the respective parties in the action to quiet title as framed therein.

ID.—JUST AND EQUITABLE JUDGMENT.—It is held that, accepting the facts found, as must be done under the established rule applicable to appellate tribunals, the judgment of the lower court as rendered for each party is not only amply sustained, but is eminently just and equitable.

APPEAL from a judgment of the Superior Court of Humboldt County. Geo. D. Murray, Judge.

The facts are stated in the opinion of the court.

J. N. Gillett, F. A. Cutler, and Gillett & Cutler, for Appellant.

Mahan & Mahan, Otto C. Gregor, and George W. Hunter, for Respondent.

BURNETT, J.—The record contains evidence of the following facts: In 1853 the defendant left Germany, his native land, and, coming to the United States, located in the city of Cleveland, Ohio. There he became well acquainted and friendly with another German by the name of Bodenstein, the grandfather of Ida Bohn, the plaintiff herein. She and her parents since birth had lived in Cleveland. Defendant came to California in 1858, and, in 1860, located on the land in dispute, known as Gunther's Island. Upon returning to Germany in 1893 he stopped at Cleveland for the purpose of visiting his friend, Bodenstein, and there he became acquainted with Mr. and Mrs. Bohn and their daughter Ida, plaintiff herein. He formed an attachment for the girl and he concluded that it would be a good plan to get the Bohns to permit him to take Ida to California and to make her home with him, his purpose being to adopt her as his child and thereby enable her to inherit his property. He was a bachelor, and there was no one about him for whom he had any special fondness. Prior to 1900 some friendly correspondence passed between him and Mrs. Bohn in which he expressed his desire to have her daughter Ida come to California to make her home with him. The parents objected to this. In 1900 he made a trip to Cleveland and spent nine weeks at the home of the Bohns. On one occasion he put his hand upon Ida's shoulder and told her that he had come to Cleveland

for the purpose of taking her with him to California, and, before leaving for home, he told her parents that he would see them all in California before a great while. After returning to Eureka further correspondence ensued between him and Mrs. Bohn in which he urged her to persuade Mr. Bohn to dispose of his property there and come to California. In 1901 the Bohns did dispose of their property at a sacrifice, he being engaged in the mercantile business, and they came to Humboldt county, with the understanding that the realty herein involved should become the property of plaintiff. Among the letters from Mr. Gunther to Mrs. Bohn was one dated Eureka, December 21, 1899, which expresses clearly his sentiments toward plaintiff and his purpose in relation to the property at that time. In the letter, among other statements, he used this language: "Ever since I came from Europe six years ago, I have been thinking what to do with my property in case I die. My half-brothers and sisters would be glad if I died, so that they could get my money and I do not intend that they shall get it. . . . Last year I built a new house, and I have been thinking what would become of that house if the people I have, left me, and I have thought of Ida ever since we moved in the house. . . . I was confident you would not object if I adopted Ida as my daughter since she would be your child as much as she ever was, nor could I think more of Ida after adopting her than I do now, but I would have the consolation to know that my property after I die would not be ate up by lawyers, or go to parties who do not deserve it." In the same letter he wrote to Ida: "Why I was so anxious that you should come now, I have explained to your mother. You may not be able to judge of the matter now as well as in later years, but in the end you will find that if my plans do not succeed my intentions were good." Some time after the Bohns arrived in Eureka and were living on the island, the defendant made this statement to Mrs. Bohn: "Now, I will have to get this fixed up for Ida; I want to get that all fixed right, these dizzy spells may come over me at any time, and my money would go where I wouldn't want it to, and I am going to look after that." Shortly after the Bohns arrived, defendant asked plaintiff how she spelled her name. He made no explanation at that time, but later he gave her

18 Cal. App.—13

a little blue slip of paper reciting the fact that he had made a deed in her favor to the island property, to be delivered upon his death, and placed it in escrow with one G. R. Georgeson. The slip contained the words: "Deed left with G. R. Georgeson, and acknowledged by George T. Rolley," and the date of the deed was given, and at the time the slip was delivered, defendant said to plaintiff: "If anything happens to me, in case of my death, you just give this little slip of paper to Mr. Georgeson, and he will give you the deed." This deed was dated August 19, 1901, and it is spoken of as the escrow deed. Other deeds were also executed, but we need not trace the history of the various transactions. The action was brought to quiet title and to cancel a deed to defendant bearing the date of February 10, 1904, and signed and acknowledged by plaintiff one week later, and recorded by defendant on the eleventh day of January, 1905, it being alleged in the complaint that said deed was signed and acknowledged with the express understanding that it "was not to be delivered or become operative except and only in the event that said plaintiff died during the life of said defendant"; and, furthermore, that said defendant, "in violation of said understanding and agreement had between plaintiff and defendant in relation to said instrument, obtained possession of said instrument and unlawfully appropriated said instrument and in violation of the confidence and trust reposed in said defendant by said plaintiff and without her knowledge or consent recorded said instrument." Defendant filed an answer and cross-complaint in which there is a positive denial that plaintiff is or ever was the absolute owner of the property, or that there was any such agreement as set forth in the complaint in relation to said deed of February 10, 1904, or that he surreptitiously or in violation of any confidence obtained possession of it, and it alleges misrepresentations and fraud on the part of plaintiff whereby defendant was induced to execute a deed to plaintiff on the eighth day of September, 1903, and another on February 9, 1904. The cross-complaint recites fully the purpose and understanding as to these instruments and the said escrow deed of August 19, 1901, and avers that plaintiff, wrongfully and maliciously and with intent to cheat and defraud defendant and secretly and without the knowledge or consent of defendant, obtained possession of the last-named

deed and, "upon the thirty-first day of March, 1905, the date of the commencement of this action, said plaintiff wrongfully, unlawfully and without right placed said escrow deed of record." Defendant therefore prayed for the cancellation of said escrow deed and for a decree quieting his title to the property. A jury was called at the trial, and they made certain special findings that were adopted by the court, which are directly opposed to appellant's theory of the case as outlined in his cross-complaint. They found that the plaintiff made no fraudulent representations nor false statements to defendant, that she did not (as alleged in the cross-complaint) conspire or design to bring about an estrangement in the relations between defendant and his niece, Martha Gunther. They answered "No" to the question: "Did Robert Gunther make, execute and deliver to Ida Bohn the deed dated September 8, 1903, and known as the life estate deed, solely for the purposes of discouraging or preventing any contest or litigation against his estate by his niece Martha Gunther, by making it appear that the record title to the property therein described stood in plaintiff?" They answered "Yes" to this interrogatory: "Did Robert Gunther execute and deliver to Ida Bohn the deed dated September 8, 1903, and referred to as the life estate deed, freely and voluntarily and not by reason of false and fraudulent misrepresentations made by Ida Bohn to Robert Gunther?" They found that Robert Gunther did "execute and deliver to Ida Bohn the deed dated February 9, 1904, and spoken of as the absolute deed, freely and voluntarily and not by reason of false or fraudulent misrepresentations made by Ida Bohn to Robert Gunther"; that it was the understanding of both parties at the time that Ida Bohn signed and acknowledged the deed from her to Robert Gunther, dated February 10, 1904, that said deed should not become operative unless Ida Bohn should die before Robert Gunther. As to this last an additional finding was made by the court that "The deed signed and acknowledged by plaintiff to defendant, bearing date February 10, 1904, was not delivered by plaintiff to defendant."

As to the foregoing findings, it may be said that there is, in our judgment, abundant evidence to support each of them, as set forth in the brief of respondent, but we pass them by without further notice and proceed to consider other findings

which are decisive of the whole controversy. These are special issues, No. 4, answered "No" by the jury, and No. 5, answered "Yes," and adopted by the court, and finding No. 8, made by the court of its own motion. These findings are to the effect that "neither Ida Bohn nor any other person acting in her behalf took the deed made by Robert Gunther to Ida Bohn, bearing date August 19, 1901, and spoken of as the escrow deed, from the possession of Robert Gunther without right, wrongfully, secretly and without the knowledge and against the consent of Robert Gunther," and furthermore, that this deed "was delivered by Robert Gunther to Ida Bohn on the stairway at his house on the twentieth day of February, 1904," or some time thereafter; "that the deed made by Robert Gunther to Ida Bohn bearing date August 19, 1901, was by said Gunther given as a deed of gift to said Ida Bohn on the twentieth day of February, 1904, or within a short time thereafter, with the intention on his part to thereby deliver the said deed to her and thereby pass the title from him to her so that said lands should become the property of said Ida Bohn, subject to the right of the defendant to have the use of and the income from said lands for and during the term of his natural life." There is no contention of any undue influence or of any unsoundness of mind on the part of defendant. It is manifest, therefore, that these findings as to the delivery of said escrow deed by defendant to plaintiff, if supported by the evidence, justify the judgment in favor of plaintiff, as they relate to a time subsequent to the other transactions to which we have referred. This deed was prepared by defendant, all in his own handwriting, as the testimony shows. It was in the possession of Mr. Georgeson for a long time, but defendant finally took it and placed it with his papers in his room at his home on the island. After the execution of the said deed of February 9, 1904, defendant had a conversation with plaintiff in reference to this transaction and he said to her: "You are with the Mahans and tomorrow morning when you go over there you tell the Mahans everything we have done, and if they can suggest anything that will be more secure, I will do anything, for I want you to have the place and I never want you to be bothered." She had a conversation with the Mahans, as directed, and she re-

ported it to Mr. Gunther. He became angry in reference to
a statement made by the Mahans that he might take the deed
and record it, and he said to her: "Well, do they think I am
a child? This is no child's play. When I give a thing I give
it. You never saw me take back a present yet." She is cor-
roborated in this by her mother. The defendant himself also
testified, on cross-examination, that "After the absolute deed
was made there was a conversation with Ida in which she
stated she hoped I would not be sorry for what I had done,
and I said I would not because I knew my party and never
took a gift back." He places the conversation, though, at a
different time and occasion. It is very reasonable to conclude
that in this statement he referred to the gift of this island
property. As to the delivery of this "escrow" deed plaintiff
testified: "It was a few days after or sometime after that, a
short time, I was on my way upstairs one evening, and I was
right about the middle of the stairway, and Mr. Gunther's
room comes right out at the foot of the stairway. I was
about the middle of the stairway and Mr. Gunther came out
of his room and walked around the stairway, and he had a
paper in his hand in an envelope, and he called to me and
said, 'Here, Ida, to show that I really want you to have my
property, here is a deed all in my own handwriting; now if
anybody should say I was crazy when I gave you my prop-
erty, that will show that a crazy man could never write a deed
like this. It took me a whole week to write it. It will show
everybody that I really want you to have my property,' and
he said 'Have you got a good place to keep it?' I said: 'Yes,
I had.' He said: 'Well, keep it so you can put your finger
on it at any time,' and I took it upstairs with me. I had
never seen that paper prior to the time he handed it to me
there on the stairway. It was in his handwriting." There-
after she kept the deed in her possession. Plaintiff's mother
and father also testified substantially the same as to the occur-
rence, the mother adding that when she went upstairs Ida
showed her the deed. Defendant also represented to others
that Ida owned the island. He explains this transaction by
stating that "Miss Bohn knew of the whole thing, that the
whole thing was a sham in her favor to prevent my niece
from bringing a contest. She knew she was not getting any

property by that transaction. I was carrying out this fraud to prevent my niece from contesting my will.'' But regardless of the question suggested by respondent, whether a court of equity should look with favor upon testimony coupled with the statement that the witness was simply carrying out a fraud, it is clear that the court and the jury had the legal right to believe the testimony of plaintiff and her witnesses, and that said finding in reference to this deed represents a rational inference from the showing made by respondent. Indeed; she might have relied upon the presumption arising from the possession of the deed, at least, until overcome by appellant's evidence (*Zihn* v. *Zihn*, 153 Cal. 407, [95 Pac. 868]), but the presumption was strongly fortified by the positive testimony of a number of witnesses.

Appellant complains also of that portion of the finding and judgment that accords to him the use and income of the property during his life. It is assailed as representing a timorous compromise, entirely unsustained by the evidence and clearly without the issues in the case. It is asserted that ''At the end of the trial even the plaintiff as a human being must have recoiled from pursuing her efforts to utterly despoil the defendant and all save defendant must have been ready to compromise upon the theory of this finding.'' Manifestly, we are not in a position to verify this opinion of appellant, but from the fact that respondent has taken no appeal we may surmise that she is content with the result. In that, however, we see nothing to her discredit.

As to the evidence, there is much to show that, until an unfortunate misunderstanding arose between the parties growing out of attentions paid to respondent by a young man whom appellant seems to have disliked, it was the manifest purpose and understanding of all the parties concerned that appellant should enjoy the property while he lived and that then it should vest absolutely in respondent. From the correspondence hereinbefore referred to, it is clear that the Bohns came to California with the understanding that Ida was to have the property, but that appellant should not be deprived of its use or income while he lived. Evidence of this, also, is found in the execution of said escrow deed of August 19, 1901, and of the life estate deed of subsequent date giving him control

of the property while he lived. Indeed, the testimony of
plaintiff alone is sufficient to support the conclusion that this
was the understanding and intention of the parties.

It is true that this issue was not specifically raised by the
pleadings. The title in fee, however, was directly in issue and
this would include any less estate, and the court, under our
practice, in an action to quiet title would certainly not be
precluded from determining just what estate each party owns.
The situation is similar to that involved in the Zihn case,
*supra,* where there was a finding that ''It was understood and
agreed by and between the parties hereto that the plaintiff
should have a life estate therein, and that said grantees should
become the owners in fee thereof, subject to the plaintiff's
life estate and right to use and occupy the same for his life.''
In discussing this, the supreme court, through Mr. Justice
Angellotti, says: ''This finding, which is upon a matter not
specifically referred to in any of the pleadings, does not neces-
sarily imply any lack of understanding upon the part of the
donor as to the effect of the absolute deed of gift, or that the
deed as delivered was not fully in accord with the desire and
intention of the donor, but it is entirely consistent with the
fact of a separate understanding and agreement then assented
to by the grantees, relying on which plaintiff was willing to
make and knowingly and voluntarily made delivery of the
absolute deed of gift with the full understanding of its legal
effect.'' The only question could be whether a parol agree-
ment of like import could be enforced, but the power of a
court of equity to accomplish this should hardly be open to
controversy. The point, though, is not made by appellant.
Besides, if such contention should be made and upheld, the
result would be to leave the absolute title in respondent, and,
under the circumstances, any court should hesitate to deprive
appellant of the fruits of the judgment, although such dis-
position may be invited by him.

Appellant laments the inequality of the contest before the
jury between the tears of an attractive young woman and the
unalluring but ingenuous story of an old man. The tears,
however, are not preserved in the record. If they were, we
do not know how much they might affect the judgment of
this court. It is sufficient to say, though, that, accepting the

facts as we must, the judgment of the lower court is not only amply sustained but that it is eminently just and equitable.

The judgment is affirmed.

Hart, J., and Chipman, P. J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on March 8, 1912, and the following opinion then rendered thereon:

BURNETT, J.—The petition for rehearing is addressed to the proposition that the finding of the lower court to the effect that plaintiff is entitled to the fee, subject to the right of defendant to the possession and use of the property during his life, is not within the pleadings and is unsupported by the evidence.

It is, no doubt, true, as claimed by appellant, that "the plaintiff's case cannot be better as proved than it is as stated. A party cannot travel out of the matter alleged in his pleading to make a ground of relief. A finding is useless and idle unless the facts found are within the issues and a judgment based upon such facts cannot be sustained." And we have no fault to find with the cases cited in support of the doctrine, but they involve a different situation from what we have here. It seems plain on principle that, in legal procedure as well as in physics, the whole includes a part, and that it cannot be said that this finding is entirely without the matter alleged in the pleadings.

In the Zihn case, 153 Cal. 405, [95 Pac. 868], the principle is recognized, where the supreme court approved a finding of the lower court awarding the plaintiff therein a life estate under a deed absolute in form, notwithstanding that there was no specific averment in any of the pleadings as to such life estate.

In *Pennie* v. *Hildreth*, 81 Cal. 133, [22 Pac. 400], which was an action to quiet title, the supreme court said: "If the plaintiff claims a fee simple, he may show that he has nothing more than a lien or any interest less than he claims, and that he, the defendant, has an interest also, either paramount or subordinate to that of the plaintiff, and the decree of the court should declare the rights of the parties in the property accord-

ingly. If the defendant had an equitable title to one-half of the property in controversy, whether that interest was subject to the mortgage of the plaintiff or paramount to it, he had a right to have it so decreed and the interest of the plaintiff declared.''

As to the evidence to support the finding, we think there can be no kind of doubt. Much of it we deemed unnecessary to set out in the former opinion, but we called attention to certain facts and circumstances which appeared to us sufficient rationally to justify the court's conclusion. In her answer to appellant's petition for rehearing, respondent points out in the transcript unequivocal testimony to the effect that it was the purpose and understanding of appellant that he should retain the life interest in the property. We quote simply from one of the witnesses as to a conversation with Mr. Gunther: ''I said, I see you have deeded your island away. He said, yes, and in a moment he said he wanted his property to go where he wanted it to go while he was alive. He said in that conversation that he had a life lease in the property. . . . He simply said he had reserved a life estate, a life lease.''

Some asserted circumstances are mentioned by appellant concerning which the record is entirely silent. We need not, of course, remind the able counsel for petitioner that we are controlled by the record as we find it.

Appellant seems to misconstrue the spirit of an expression found in the concluding paragraph of the former opinion and, as it is unnecessary to the decision, the said paragraph is stricken out and there is substituted therefor the following: ''It is sufficient to say in conclusion that, accepting the facts as we must under the well-established rule applicable to appellate tribunals, the judgment of the lower court is not only amply sustained but is eminently just and equitable.''

The petition for rehearing is denied.

Hart, J., and Chipman, P. J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 8, 1912.